UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **RIVERDALE MILLS CORPORATION,** ) ) **Plaintiff,** ) ) v. ) ) **CAVATORTA NORTH AMERICA, INC., METALLURGICA ABRUZZESE SPA, AND TRAFILERIA E ZINCHERIA CAVATORTA SPA,** ) ) ) ) ) ) **Defendants.** ) ) | **CIVIL ACTION** **NO.  4:15-CV-40132-TSH** |

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (Docket No. 2)**

**November 18, 2015**

**HILLMAN, D.J.**

Pending before this Court is Riverdale Mills Corporation's motion for preliminary injunctive relief.  For the reasons set forth below, the motion (Docket No. 2) is ***denied*** in part and ***granted*** in part.

**Background[1]**

Riverdale Mills Corporation (Riverdale or Plaintiff), is a Massachusetts corporation that manufactures and distributes welded wire mesh for use in marine traps.  Riverdale was formed in 1980 with the goal of producing a higher-quality material for making traps for the lobstermen and fishermen of New England.  Riverdale's founder, James Knott, Sr., developed a new material, sold

---

[1] These findings of fact are drawn from the evidence presented during a three-day hearing on Riverdale Mills Corporation's motion for preliminary injunction, as well as from the exhibits filed in conjunction with the parties' memoranda in support of and in opposition to this motion.

under the label "Aquamesh,"® which is a wire mesh product designed to withstand harsh marine conditions. Riverdale has been manufacturing and selling Aquamesh® since the early 1980s.

Aquamesh® is manufactured using a "galvanized after welding" (GAW) process followed by a polyvinyl chloride (PVC) coating (GAW + PVC). The combination of GAW and PVC extends the durability and longevity of the wire mesh in marine environments. The GAW process is performed as follows. First, steel strands are welded together to create wire mesh. Then, the wire mesh is cleaned and a "flux" is applied to the surface. Next, the mesh is galvanized by being slowly passed through a tank of molten zinc. The mesh emerges with a heavy zinc coating, sealing each welded steel joint and protecting it from corrosion. Finally, the galvanized wire mesh is covered with marine-grade PVC, which forms a protective layer that adheres to the galvanized wire. The finished product, GAW + PVC mesh, is then used to make marine traps.

There is an alternative, less-expensive manufacturing process called "galvanized before welding" (GBW). This process involves lightly coating individual steel strands with zinc and then welding them together to form wire mesh. The high temperature used to weld the strands burns off the zinc coating at the welded joints, leaving them unprotected by a continuous zinc coating and making them more prone to corrosion after prolonged exposure in marine environments, even if the mesh is coated in PVC. The GBW mesh is also prone to corrode where the strands of wire are spliced in the process of making the traps. In the late 1980s and early 1990s, Riverdale launched an extensive advertising campaign explaining the GAW process and educating consumers regarding its superiority to the GBW process in terms of durability and longevity.

Cavatorta North America, Inc. (Cavatorta) is a Massachusetts corporation, established in 2007 as the local distributor of Italian-made wire mesh. Cavatorta's main focus is on GAW + PVC mesh, used for making marine traps, but it also makes non-GAW products to serve the fence

and cage industries. Metallurgica Abruzzese SPA (Metallurgica) is the Italian company that manufactures the GAW + PVC wire mesh sold by Cavatorta; specifically, a product called "SEAPLAX,"™ which directly competes with Riverdale's Aquamesh®. The SEAPLAX™ product and the Aquamesh® product are viewed similarly and used interchangeably by fishermen and marine trap distributors.[2]

SEAPLAX™ is manufactured with galvanization before and after the welding process, with a PVC coating. It is packaged and sold in rolls, and each roll is prominently labeled as "GAW + PVC." Cavatorta also advertises on its website that SEAPLAX™ is galvanized after welded and coated with PVC. The manufacturing occurs in two production runs per year, each lasting approximately forty days. Cavatorta currently sells SEAPLAX™ to nine customers in the United States and Canada. These customers are not individual fishermen; they are companies that buy rolls of wire mesh and then use the mesh to build marine traps for sale to fishermen.

Between April of 2014 and May of 2015, Metallurgica made a significant manufacturing error and produced a large quantify of SEAPLAX™ that was GBW, not GAW. This error occurred during multiple production runs and resulted in a large quantity of mesh—somewhere in the vicinity of three million pounds—that was supposed to be SEAPLAX™ but was in fact not GAW. Despite the scale of this error, Metallurgica claims that it went unnoticed, and the mesh was packaged as SEAPLAX™ and sent to Cavatorta in Massachusetts for distribution. Much of the mesh was distributed to Cavatorta's customers. The production error came to the attention of

---

[2] Peter Christian, Director of Cavatorta, explained during the hearing that the third Defendant in this case, Trafileria E Zincheria Cavatorta SPA, is a member of the so-called "Cavatorta group" but does not manufacture or distribute SEAPLAX™. Cavatorta obtains all of its SEAPLAX™ product from Metallurgica, which is the manufacturer. Plaintiff has not presented evidence to challenge this assertion.

Cavatorta and Metallurgica in May of 2015, when Cavatorta's largest customer complained that it had received SEAPLAX™ that was not GAW.

In response to learning that there was a problem with the SEAPLAX™ product, Cavatorta initiated a process of notification, recall, and compensation. Each of Cavatorta's nine customers, all of whom had purchased SEAPLAX™ at some point after January 1, 2013, were contacted. Cavatorta reached agreements with some of these customers regarding discounts and other forms of monetary compensation for the error, and it repossessed much of the mistaken product and transported it to a warehouse. Currently, this warehouse contains approximately 1.5 million pounds of "SEAPLAX™" that is not GAW. The product is being held in isolation.

One of Cavatorta's nine customers is Robert Ketcham, who owns and operates a marine hardware store in New Bedford called Ketcham Traps. Ketcham purchases both Aquamesh® and SEAPLAX™ and uses the mesh to build marine traps. Ketcham received some of the SEAPLAX™ that was not GAW, and his customers began to complain in the spring of 2015 when their traps showed early signs of corrosion. Around the same time, the Director of Cavatorta, Peter Christian, personally contacted Ketcham and explained the production error. Ketcham has not yet been satisfied with Cavatorta's offers to make him whole; however, there is no dispute that Ketcham is aware of the mistake and is not using or selling mislabeled SEAPLAX™.

Riverdale initiated this lawsuit on September 15, 2015, asserting three counts: (1) false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a); (2) violation of Mass. Gen. Laws ch. 266, § 91; (3) violation of Mass. Gen. Laws ch. 93A; and (4) Common Law Unfair Competition. Riverdale seeks the following injunctive relief:

a. Requiring Defendants to cease all sales, including any importing of their falsely labeled Seaplax product;

    b. Restraining and enjoining Defendants, along with their officers, agents, servants, employees and any persons in active concert or participation with them, from making any false or misleading statements in their advertisements, promotions, or website. Without limiting the forgoing, Defendants shall not falsely represent that their Seaplax product is galvanized after welding.

    c. Requiring Defendants to recall all of their Seaplax product falsely labeled as galvanized after welding;

    d. Requiring Defendants to prominently label their Seaplax product as not being galvanized after welding[3];

    e. Requiring Defendants to promptly issue corrective communications to the market stating that their previously sold Seaplax product was not galvanized after welding.

(Docket No. 1 at 23.) Defendants have consented to (a), (b), and (d). The remaining requests for relief, (c) and (e), for recall and corrective advertising, respectively, are contested.

## Discussion

### *Standard of Review*

"[T]he test governing the award of a preliminary injunction . . . requires consideration of (1) the movant's likelihood of success on the merits, (2) the potential for irreparable harm, (3) a balancing of the relevant equities, and (4) the effect on the public interest." *Campbell Soup Co. v. Giles*, 47 F.3d 467, 470 (1st Cir. 1995). "Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996). When granting injunctive relief, a court should choose "the least intrusive method of ensuring compliance with the law." *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 49 (1st Cir. 2000). "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

---

[3] Although broadly worded, it is understood that this element of the requested relief requires labeling of only the SEAPLAX™ product that was mistakenly produced as non-GAW.

Although not required, "evidentiary hearings are often desirable at the preliminary injunction stage" when material facts are contested. *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 223 (1st Cir. 2003). A court need not engage in a full evidentiary hearing "but must offer the parties 'a reasonable opportunity to put forth, and to oppose, the disputed evidence.'" *Campbell Soup*, 47 F.3d at 470-71 (quoting *Schulz v. Williams,* 38 F.3d 657, 658 (2d Cir. 1994) (per curiam)). In granting or refusing interlocutory injunctions, the court must "state the findings and conclusions that support its action." Fed. R. Civ. P. 52(a)(2).

### 1. *Likelihood of Success on the Merits: Lanham Act Claim for False Advertising*

Riverdale's primary claim against Defendants is for false advertising under the Lanham Act, 15 U.S.C. § 1125(a).[4] As explained below, I do not find that Riverdale has a likelihood of success on the merits of its false advertising claim. "The Lanham Act prohibits false and misleading descriptions of products and services in interstate commerce." *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 310 (1st Cir. 2002) (citing 15 U.S.C. § 1125(a)). "The statute was designed to protect consumers and competitors from any duplicitous advertising or packaging which results in unfair competition." *Id.* Section 1125(a) provides in pertinent part as follows:

> (a) Civil action
>
> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which--
> . . .

---

[4] Plaintiff's state-law false advertising claim, brought pursuant to Mass. Gen. Laws. ch. 266, § 91, "rises or falls with the federal claim." *Arborjet, Inc. v. Rainbow Treecare Scientific Advancements, Inc.*, 63 F. Supp. 3d 149, 157 (D. Mass. 2014) *rev'd in part on other grounds*, 794 F.3d 168 (1st Cir. 2015) (quoting *American Medical Sys., Inc. v. Biolitec, Inc.,* 774 F.Supp.2d 375, 393 (D. Mass. 2011).

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Thus, a plaintiff must demonstrate five elements in order to prove a false advertising claim under the Lanham Act:

> (1) [T]he defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Cashmere & Camel Hair Mfrs. Inst.*, 284 F.3d at 310-11. "A plaintiff can succeed on a false advertising claim by proving either that the defendant's advertisement is literally false or implicitly false—that is, the advertisement is true or ambiguous yet misleading." *Id.* at 311. "Where the advertisement is literally false, a violation may be established without evidence of consumer deception." *Id.* Intent to deceive is not a prima facie element of a false advertising claim under the Lanham Act. *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 13 (1st Cir. 1986).

A. *Conceded Elements*

Several elements of the false advertising claim are not disputed. The parties agree that Cavatorta published statements on its website and on the labels of its SEAPLAX™ products stating that the mesh was GAW + PVC. These statements are commercial advertising or promotion for purposes of the Lanham Act. *See Cashmere & Camel Hair Mfrs. Inst.*, 284 F.3d at 306. The parties

also agree that, between April of 2014 and May of 2015, a significant quantity of mesh labeled as GAW + PVC SEAPLAX™—but not actually GAW—was sold in interstate commerce.

Regarding materiality and purchasing influence, the parties agree that there are significant differences in GAW versus GBW wire mesh.  GAW is more durable and lasts longer than GBW in marine environments.  Both types of mesh will eventually corrode, but GBW will corrode significantly more quickly.  Thus, there is no dispute that the different manufacturing processes are material and influential in the purchasing decision.

    B.  *Actual Deception or Tendency to Deceive*

Because Defendants' commercial statements were literally false—mesh that was in fact GBW was sold with a GAW label—Plaintiff is entitled to a presumption of consumer deception. *See Cashmere & Camel Hair Mfrs. Inst.*, 284 F.3d at 311.[5]  Riverdale has further argued that Defendants' manufacturing error has deceived customers and is now causing confusion in the fishing industry regarding the durability of GAW.  Although there can be no doubt that consumers were deceived before the manufacturing error came to light, Cavatorta has since taken significant steps to remedy any resulting confusion.  After learning of the manufacturing error in the spring of 2015, Cavatorta immediately contacted each of its nine SEAPLAX™ customers and alerted them of the error.  It has since repossessed all of the mislabeled product that its customers wished to return.  Metallurgica's manufacturing mistake has not been hidden from the fishing industry; indeed, it is in the best interest of Cavatorta's customers who received mislabeled product to alert

---

[5] Intent is also relevant in this regard; if Riverdale had shown that Defendants sold the mislabeled mesh with the intent to deceive, a presumption of consumer deception would follow. *See Cashmere & Camel Hair Mfrs. Inst.*, 284 F.3d at 316.  Although I find it difficult, if not impossible, to conceive of how Metallurgica could have executed two forty-day production runs, producing millions of pounds of wire mesh, without noticing that an important step in its manufacturing process had been omitted, I need not reach a conclusion regarding intent to deceive.

their own customers who may be affected. Credible testimony was presented during the hearing that the lobster-fishing industry is a tight-knit community and is generally aware of the issue through word-of-mouth communication. I am convinced that, although this mistake deceived initial purchasers for a short period of time, Defendants have taken sufficient corrective action to prevent the likelihood of ongoing confusion.

C. *Injury*

Riverdale has exerted considerable time and effort, over multiple decades, in educating consumers on the differences between GAW and GBW mesh. Indeed, Riverdale has built its reputation on the efficacy of the GAW process and its superior lifespan in harsh marine environments. The lobster fishing season is currently nearing its end in New England. Riverdale predicts that when the traps are pulled out of the water and stored for the winter, those made from GBW mesh will develop blooms of rust. Riverdale further predicts that this will cause fishermen who thought that their traps were made from GAW mesh—but who actually received mesh from one of Metallurgica's failed production runs—to doubt Riverdale's claims about the long-lasting nature of the GAW product. In turn, this will harm the reputation that Riverdale has worked so hard to form.

The reputational harm caused by selling a falsely labeled product is difficult to prove, and an erosion of consumer confidence in a product can take time to fully develop. *See Camel Hair & Cashmere Inst. of Am., Inc.*, 799 F.2d at 15. Here, however, Plaintiff has presented nothing beyond mere conjecture with regard to the anticipated harm to Riverdale's reputation. And, significantly, Riverdale has experienced an increase in sales since the industry became aware of Defendants' mistake. Moreover, the false statements at issue occurred during an isolated period of time. No doubt this would be a different case entirely if Plaintiff had presented evidence that Defendants

were continuing to sell mislabeled mesh. Considering the significant steps that Defendants have taken to inform their customers of the mistake and sequester the mislabeled product, I infer that the industry is generally aware of the problem and will not blame the GAW process, or Riverdale by association, for any prematurely rusting marine traps. Accordingly, I do not find that there is a likelihood of injury to Riverdale's reputation.

### 2. *Potential for Irreparable Harm, Balancing of the Equities, and the Public Interest*

Irreparable harm is measured "on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits," meaning that "[t]he strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." *Braintree Labs., Inc. v. Citigroup Global Mkts. Inc.,* 622 F.3d 36, 42–43 (1st Cir. 2010) (citations omitted). This analysis dovetails with the likelihood of injury, as explained above. Because I find that Riverdale is not in imminent danger of significant damage to its reputation, the requirements for irreparable harm have not been satisfied. Similarly, the equities weigh in favor of Defendants. Defendants have taken accountability for their mistake and have corrected it, and the status quo has returned without the need for injunctive relief. The public interest is not served by an order for something that has already been done. Defendants have repossessed the outstanding erroneous product and have alerted their customers. I find that these actions are sufficient to protect consumers from the harm of false advertising.

## Conclusion

For the reasons set forth above, Plaintiff's motion for preliminary injunction (Docket No. 2) is ***denied*** with respect to the disputed categories of requested relief and ***granted*** as follows:

1. The Defendants, their officers, agents, servants, and employees are hereby enjoined from manufacturing, distributing, shipping, advertising, marketing, promoting,

transferring, selling, or offering to sell SEAPLAX™ wire mesh labeled as "galvanized after welded" or "GAW" if such product is in fact not galvanized after welded.

2. The Defendants, their officers, agents, servants, and employees are hereby enjoined from making any false or misleading statements in their advertisements, promotions, and website regarding any SEAPLAX™ product being galvanized after welded if the product is in fact not galvanized after welded.

3. The Defendants, their officers, agents, servants, and employees shall immediately label, in a commercially reasonable manner, all SEAPLAX™ product that is in fact not galvanized after welded as being not galvanized after welded.

**SO ORDERED.**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**
