## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RIVERDALE MILLS CORPORATION  ) | |
|       Plaintiff           ) | |
|                    ) | |
| vs.                 ) | |
|                  ) | CA. NO. 15-40132 |
| CAVATORTA NORTH AMERICA, INC.,  ) | |
| METALLURGICA ABRUZZESE SPA, and) | |
| TRAFILERIA E ZINCHERIA  ) | |
| CAVATORTA SPA       ) | |
|       Defendants    ) | |

## DEFENDANT, CAVATORTA NORTH AMERICA, INC.'S OPPOSITION TO THE PLAINTIFF, RIVERDALE MILLS CORPORATION'S MOTION TO DISMISS COUNTERCLAIMS FILED BY CAVATORTA

NOW COMES the defendant, Cavatorta North America, Inc. (herein "defendant" or "Cavatorta") in the above-entitled matter and hereby OPPOSES the plaintiff, Riverdale Mills Corporation's (herein "plaintiff" or "Riverdale") Motion to Dismiss the Counterclaims filed by Cavatorta. In support of its Opposition, defendant Cavatorta states as follows:

Riverdale's witnesses testified during the preliminary injunction hearing that Riverdale sent emails on October 14, 2015 to Defendants' customers "to gain market share from Cavatorta's misstep." The emails did not mention any anticipated subpoena. Instead, Riverdale attached to the emails an abridged version of certain pleadings and described the issues in this case in a manner calculated to harm Defendants' reputation with their customers. These were not innocuous communications intended to provide information about this case to Defendants' customers. The Riverdale employee who authored the emails testified that he knew before sending the emails that all of the recipients were already aware of the issues. Thus, Riverdale's email "blast" was part of Riverdale's strategy to improperly compete with Defendants by mischaracterizing the issues in this case and Defendants' production error. Riverdale's strategy

is bearing fruit—each of its witnesses testified about the substantial increase in market share that Riverdale has enjoyed at Defendants' expense.

The litigation privilege does not shield Riverdale's improper conduct.  The privilege rests on the principle that parties and their counsel must be allowed to fully advocate their positions in court without fear of liability for making statements in support of their advocacy.  Thus, the litigation privilege is limited to situations where the possibility of facing liability for making a statement would chill advocacy.  But Riverdale does not argue that Cavatorta's counterclaims addressing Riverdale's statements would chill Riverdale's or its counsel's ability to advocate Riverdale's positions.  Rather, Riverdale argues that its emails are shielded because the subject line of the emails is "Riverdale Mills vrs [sic] Cavatorta NA et al." and the litigation is referenced in the emails.  If this was enough to trigger the litigation privilege, the privilege would be boundless because a party could shield an improper statement simply by referencing the parties or the litigation.  The litigation privilege, like all privileges, *is* limited.  In particular, the litigation privilege does not shield parties that defame one another or publicize information in order to harm their opponent's reputation.

Moreover, at least three of the parties that received Riverdale's emails did not receive a subpoena, and several parties that received a subpoena from Riverdale did not receive an email. None of the emails mention a subpoena, and some of them do not mention Riverdale's counsel. Thus, the email blast was not sent to alert customers about a forthcoming subpoena.  Instead, the emails were sent, as Riverdale's Vice President of Sales and Marketing testified, "to gain market share from Cavatorta's misstep."  The litigation privilege does not shield such conduct.

Riverdale is competing unfairly and Cavatorta's counterclaims set forth the bases for its claims addressing that unfair competition, as required by the liberal pleading standards of FED.

2

R. Civ. P. 8(a) & (d).   Accordingly, the Court should deny Riverdale's Motion to Dismiss Cavatorta's counterclaims.

## FACTUAL BACKGROUND

Defendants learned in May, 2015 that, due to a production error at Metallurgica's manufacturing plant in Italy, SEAPLAX[TM] had been manufactured using the "Galvanized Before Welding" ("GBW") process rather than the "Galvanized After Welding" ("GAW") process.[1] (Dkt. No. 35, Preliminary Injunction Order ("PI Order"), at 3-4.)   Cavatorta's Director, Peter Christian, promptly contacted Defendants' customers that may have received the improperly-labeled SEAPLAX[TM] wire mesh.   (*Id.* at 4.)   At the same time, Mr. Christian contacted Defendants' largest competitor, Riverdale, to inform them of the production error so that Riverdale would "hear it direct, like, from him and not on the street."   (Exh. 1, 11/13/15 Preliminary Injunction Hearing Transcript ("Day 1 Tr."), at 13:17-14:4; 40:17-41:21 (Riverdale salesman C. Pennypacker).)   Defendants thereafter initiated a process of notification, recall and compensation to resolve customers' concerns stemming from the production error.   (Dkt. No. 35, PI Order, at 4, 8.)   The end users who may have been affected also were made aware of the production error and Defendants' efforts to address the error.   (Exh. 2, 11/14/15 Preliminary Injunction Hearing Transcript ("Day 2 Tr.") at 47:7-23 (P. Christian); Dkt. No. 35, PI Order, at 9-10 ("I am convinced that, although this mistake deceived initial purchasers for a short period of time, Defendants have taken sufficient corrective action to prevent the likelihood of ongoing confusion.... Considering the significant steps that Defendants have taken to inform their

---

[1] "Defendants" refers only to Metallurgica and Cavatorta because Trafileria has no involvement in the issues raised in this lawsuit and it did not file counterclaims.   (Dkt. No. 42, Trafileria Answer.)   Riverdale refuses to dismiss Trafileria even though Defendants have shown that the documents Riverdale relies on to argue that Trafileria *might* have had some role were created at least 10 years before the events at issue. Trafileria will address this issue at the appropriate time.

customers of the mistake and sequester the mislabeled product, I infer that the industry is generally aware of the problem and will not blame the GAW process, or Riverdale by association, for any prematurely rusting marine traps.").)

Riverdale sued Defendants four months later, alleging that Defendants' production error damaged Riverdale, and moved for a preliminary injunction.  (Dkt. Nos. 1 & 2.)  The parties agreed to a discovery schedule on October 6, 2015 and conducted expedited discovery in anticipation of a hearing on the preliminary injunction motion.  (Dkt. No. 17.)  On October 14 and 15, 2015—roughly five months after Mr. Christian contacted Riverdale and Defendants' customers regarding the production error—Riverdale's Vice President of Sales and Marketing, Larry Walsh, sent emails to at least 12 of Defendants' customers, attaching a few pages from Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction and two supporting affidavits.  (Exh. 3[2]; *see also* Exh. 1, Day 1 Tr. at 81:9-83:15 (L. Walsh).)

Mr. Walsh's emails warned Defendants' customers that Riverdale was seeking an injunction to prevent Defendants from selling SEAPLAX$^{TM}$, while mischaracterizing relevant facts and offering to provide even more information and suggesting that Defendants' customers seek monetary compensation.  (Exh. 3.)  Mr. Walsh did not tell any of Defendants' customers that a subpoena might be forthcoming, nor did he distribute any pleadings filed by Riverdale or a complete copy of Defendants' Opposition brief.  (*Id.*; *see also* Exh. 1, Day 1 Tr. at 86:25-87:5; 87:11-12)  Mr. Walsh also did not explain why he was sending information about Riverdale's preliminary injunction motion to Defendants' customers five months after Defendants had taken steps to resolve the effects on their customers.  (Dkt. No. 35, PI Order, at 3-4 (summarizing

---

[2] Plaintiff attached only one of the emails to its motion.  But the emails are not identical and, therefore, Defendants submit herewith a copy of all of the emails of which they are aware.  For the Court's convenience, the emails are grouped in a single exhibit and one copy of the attachments that Mr. Walsh sent with each of the emails is attached at the back of the group exhibit.

Defendants' actions taken after learning of the production error) & 10 ("Considering the significant steps that Defendants have taken to inform their customers of the mistake and sequester the mislabeled product, I infer that the industry is generally aware of the problem and will not blame the GAW process, or Riverdale by association, for any prematurely rusting marine traps."); Exh. 1, Day 1 Tr. at 86:16-22 (L. Walsh testifying that each of Defendants' customers who "received [one of his emails] was already aware of the issue.").)

The abridged version of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction attached to Mr. Walsh's emails excludes Defendants' legal arguments opposing a preliminary injunction.   Mr. Walsh's abridged version ends with the following truncated sentence:

> At the outset, the defendants maintain that an order to "cease its false and misleading advertising and labeling of its Seaplax [sic] product as galvanized after welding and from importing, selling and distributing its falsely labeled Seaplax [sic] product" would be meaningless, as Metallurgica Abruzzese S.p.A. continues to manufacture Seaplax by galvanizing the welded wire [….]

(Exh. 3.)   By cutting off the brief at this point, without any explanation in the cover email or elsewhere, Riverdale purposefully led the recipients—none of whom are attorneys—to believe that the Court would order Defendants to "cease…importing, selling and distributing" SEAPLAX<sup>TM</sup>.   Moreover, because the sentence is truncated, it would be reasonable for a reader to believe that Defendants continue to make SEAPLAX<sup>TM</sup> using the GBW process rather than the GAW process.   That misconception would have been avoided if Riverdale had included the *full* sentence, which ends on the next page:   "…by galvanizing the welded wire mesh ***after welding.***"   (Dkt. No. 16 at 3-4 (emphasis added; footnote omitted).)   The footnote appended to the end of that sentence, which also is on the next page of the brief, states:   "The defendants also expressly deny that the plaintiff will have a likelihood of success on the merits given the

5

underlying facts of this case but will address the same below." (*Id.* at 4 n.2.)  The referenced

discussion also was not included in the abridged version of Defendants' brief that Riverdale sent

to Defendants' customers.

Mr. Walsh mischaracterized relevant information in his emails to several of Defendants'

customers and encouraged those customers to seek monetary compensation from Defendants.

For example, Mr. Walsh corresponded with Scott Lyons at Atlantic and Gulf Fishing Supply:

> Scott, you may or may not be aware of the legal proceedings that
> Riverdale has undertaken relative to Cavatorta selling GBW
> material as GAW.
>
> I know that you are aware of the event(s).
>
> I wanted to send you this document.  Our attorneys will be ***sending
> you additional information*** and requests.   If you have any
> questions, call me or Craig.

(Exh. 3 at RIVERDALE000110-11 (emphasis added).)  Mr. Lyons responded, "[w]hat would

your attorneys need from us?   We have nothing to do with that situation." (*Id.* at

RIVERDALE000110)  Mr. Walsh responded:

> As a customer of Cavatorta's I had to put your name on the list.  If
> you did get GBW that was labeled GAW you should have received
> a notice from [Defendants] and ***some sort of monetary
> compensation*** as is mentioned in the documents I sent.  If you did
> not get GBW that was labeled GAW (as many lobster companies
> have, ***at least 2.0 million pounds*** of mislabeled materials) then you
> have nothing to add.
>
> For a full year, they were selling mislabeled product and ***traps are
> falling apart very quickly***.

(*Id.* (emphases added).)  Mr. Walsh's statements about the amount of product at issue and the

alleged effect of the production error mischaracterize the facts and are belied by the evidence.[3]

---

[3] These statements were included in Riverdale's Complaint but were not supported by evidence developed
during the discovery phase leading to the preliminary injunction hearing.

C\773514.1

Mr. Walsh similarly corresponded with other parties he knew to be Defendants' customers.  For example, Mr. Walsh wrote to Heather Dauphinee at the law firm of Ohrenberger, De Lisi & Harris, LLP:

> Heather, Craig Pennypacker gave me your e-mail so that I can send you some information on a current law suit that your husband, Fred, may be interested in.
>
> Craig has spoken to Fred about this and I understand that Fred has some issues with the lobster traps that were made with defective wire supplied by Cavatorta.  I have ***additional information*** that I can send if Fred is interested.  I appreciate your help getting this information to Fred.[4]

(*Id.* at RIVERDALE000113 (emphasis added).[5])   In this email, Mr. Walsh did not suggest anything about Riverdale's counsel potentially contacting the recipient or serving a subpoena; rather, Mr. Walsh sent the abridged pleading and affidavits and offered to provide additional information.

Riverdale did ***not*** serve subpoenas on Ms. Dauphinee or at least two other parties that received emails from Mr. Walsh.  (*Id.* at RIVERDALE000106 & 109.)   Moreover, Riverdale served subpoenas on two parties—New England Marine and Industrial, Inc.; Rose's Marine Service (Exhs. 4 & 5)—but did not send emails to those parties.

Other emails show that Mr. Walsh was making statements not only by email but also in meetings with Defendants' customers:

---

[4] It is not clear whether Mr. Walsh was discussing this lawsuit or another lawsuit against Defendants that was being planned on behalf of other parties.

[5] *See also Id.* at RIVERDALE 000107 ("Marty, I met you many years ago with Jeff Koloski when he was still working for Riverdale.  Attached is some information regarding Cavatorta's response to Riverdale's request for information."); RIVERDALE000108 ("Peter, I am not sure how much you have purchased from Cavatorta, but ***as a customer of them we are sending you the attached information regarding their response to our request.***" (emphasis added)); RIVERDALE000109 ("Mark, [a]ttached is some information regarding the comments from Cavatorta in response to our proceedings.").)

> Loreto, [d]uring my visit with you I mentioned that Riverdale was
> taking legal action against Cavatorta.    Attached is some
> information regarding the proceedings.

(*Id.* at RIVERDALE000100.)

The Court held an evidentiary hearing on Riverdale's Motion for Preliminary Injunction on November 13-15, 2015.  (Dkt. Nos. 28-30.)   When questioned at the hearing about Riverdale's intentions in sending these emails, Mr. Walsh testified that the emails were sent "to try to gain market share from Cavatorta's misstep."  (Exh. 1, Day 1 Tr., at 83:10-15; *see also Id.* at 88:2-5.)  Mr. Walsh and other Riverdale employees testified that this strategy was working— Riverdale's sales have increased 15%.  (Exh. 1, Day 1 Tr. at 49:9-13, 72:24-73:13 (C. Pennypacker); 89:10-20, 90:13-19 (L. Walsh); Exh. 2, Day 2 Tr. at 138:11-139:2 (Riverdale CEO J. Knott, Jr.).)  Riverdale's employees were unable to identify any harm to Riverdale resulting from Defendant's production error.  (Exh. 1, Day 1 Tr. at 47:12-48:8, 49:14-17 (C. Pennypacker); 91:7-92:15, 96:8-12 (L. Walsh); Exh. 2, Day 2 Tr. at 130:3-131:17, 136:4-138:10, 139:5-14 (J. Knott, Jr.); *see also* Dkt. No. 35, PI Order, at 10 (finding no "likelihood of injury to Riverdale's reputation" based on evidence presented at the PI hearing).)

The Court issued its Order granting-in-part and denying-in-part Riverdale's Motion for Preliminary Injunction on November 18, 2015.  (Dkt. No. 35.)  Defendants are not aware of any communications from Riverdale to Defendants' customers, or any other party, in which Riverdale provides a copy of the Order or discusses the effects of the Order.

Metallurgica filed its Answer on January 19, 2016.  (Dkt. No. 40.)  Based on the testimony and evidence presented at the preliminary injunction hearing, Metallurgica included counterclaims addressing Riverdale's tortious interference with Defendants' business relations with their customers.  (*Id.*)  At the same time, Cavatorta moved for leave to amend its Answer to

add similar counterclaims.  (Dkt. No. 41.)  The Court granted Cavatorta's motion on February 4,

2016, and Cavatorta filed its Amended Answer later that day.  (Dkt. Nos. 45, 46.)

## ARGUMENT

### I.     STANDARD OF REVIEW

"[W]hen confronted with a motion to dismiss, the court accepts as true all well-pleaded

facts and draws all reasonable inferences in favor of the counterclaim plaintiff." *Encompass Ins.*

*Co. of MA v. Giampa*, 522 F.Supp.2d 300, 307 (D. Mass. 2007) (*citing Brandt v Advanced Cell*

*Tech. Inc.*, 349 F.Supp.2d 54, 57 (D. Mass. 2003); *United States v. Zajanckauskas*, 346

F.Supp.2d 251, 253 (D. Mass. 2003)).  Thus, "[d]ismissal is only appropriate if the counterclaim,

so viewed, fails to allege a 'plausible entitlement to relief.'"  *Id.* (*citing Rodriguez-Ortiz v.*

*Caribe*, 490 F.3d 92, 95 (1st Cir. 2007)).

### II.    THE LITIGATION PRIVILEGE DOES NOT SHIELD RIVERDALE'S COMMUNICATIONS WITH DEFENDANTS' CUSTOMERS THAT WERE MADE FOR THE SOLE PURPOSE OF DISPARAGING DEFENDANTS

The litigation privilege "protects statements made 'in the institution or conduct of

litigation or in conferences and other communications preliminary to litigation.'"  *Encompass*,

522 F.Supp.2d at 308 (*quoting Taylor v. Swarwout*, 445 F.Supp.2d 98, 102 (D. Mass. 2006)).

Determining whether the litigation privilege applies requires "'a fact-specific analysis' on 'a

case-by-case basis.'"  *McDermott v Marcus, Errico, Emmer & Brooks, P.C.*, 911 F.Supp.2d 1, 91

(D. Mass. 2012) (*quoting Giuffrida v High Country Investor, Inc.*, 73 Mass.App.Ct. 225, 897

N.E.2d 82, 98 (2008)).  The party asserting the privilege bears the burden of establishing it.  *Id.*

(*citing Shirokov v. Dunlap, Grubb & Weaver, PLLC*, Civil Action No. 10-12043-GAO, 2012

WL 1065578, *22 (D. Mass. Mar. 27, 2012) (rejecting litigation privilege argument at the

motion to dismiss stage)).

"[T]he privilege is available only when the challenged remarks are relevant or pertinent to the judicial proceedings." *Encompass*, 522 F.Supp.2d at 308-09 (*quoting Sullivan v. Birmingham*, 11 Mass.App.Ct. 359, 362, 416 N.E.2d 528, 530 (1981)). The "pertinent to the judicial proceedings" factor should not be construed too narrowly, so as to "protect[] the integrity of the adversarial system, while still providing some limitation on malicious conduct.". *See Leavitt v. Bickerton*, 855 F.Supp. 455, 456-57 (D. Mass. 1994) (*quoting Sullivan*, 416 N.E.2d at 531; *citing Thornton v. Rhoden*, 245 Cal.App.2d 80, 89-90 (1966)).

Nevertheless, like all privileges, the litigation privilege is limited. Most importantly, the litigation privilege "may not be exploited as an opportunity to defame with impunity and unnecessary or unreasonable publication to parties outside the litigation can result in the loss of the litigation privilege." *Encompass*, 522 F.Supp.2d at 308 (*quoting Taylor*, 445 F.Supp.2d at 102); *see also Sullivan*, 416 N.E.2d at 530 ("The privilege, however, cannot be exploited as an opportunity to defame with immunity…." (*citing Mezullo v. Maletz*, 331 Mass. 233, 236, 118 N.E.2d 356 (1954))). Accordingly, "the privilege may be lost by unnecessary or unreasonable publication to one for whom the occasion is not privileged." *Sullivan*, 416 N.E.2d at 530 (*citing Brown v. Collins*, 402 F.2d 209, 213-14 (D.C. Cir. 1968)).

## A.   Riverdale's Unreasonable And Unnecessary Statements Were Not Pertinent To The Litigation

The litigation privilege does not shield Riverdale's unnecessary and inappropriate communications that were made to harm, and indeed have harmed, Defendants. Riverdale knew that all of Defendants' customers to whom Riverdale directed their emails were aware of the issues before Riverdale delivered its email blast. (Exh. 1, Day 1 Tr., at 86:16-22 (L. Walsh); Exh. 2, Day 2 Tr., at 47:7-23 (P. Christian); *see also* Dkt. No. 35, PI Order, at 9-10.) Riverdale also knew before sending the emails to Defendants' customers in October that Defendants had

10

begun working with those customers months earlier to resolve issues relating to the production error.  Nevertheless, Riverdale now argues that its emails attaching an abridged version of a single pleading and two affidavits out of context were pertinent because they allegedly relate to whether the particular customer was affected by the issues in the lawsuit.  (Dkt. No. 59 at 8.)

Mr. Walsh's emails belie that argument.  For example, none of the emails request any information from the customers, including "whether they were affected by the claims contained in the lawsuit…." (Exh. 3.)  Instead, the emails show that Mr. Walsh or others at Riverdale had discussed these issues with the customers, that Riverdale knew these parties had received the product, and that Mr. Walsh was providing limited information "to try to gain market share from Cavatorta's misstep."  (Exh. 1, Day 1 Tr., at 83:10-15; *see also Id.* at 88:2-5; Exh. 3 at RIVERDALE000109 ("Because you purchased very little from [Defendants]…."), RIVERDALE000113 ("Craig Pennypacker gave me your e-mail so that I can send you some information on a current lawsuit that your husband, Fred, may be interested in.").)  Thus, Riverdale's statements are not relevant or pertinent to the litigation, and the litigation privilege does not apply.  *Encompass*, 522 F.Supp.2d at 308-09 (*quoting Sullivan*, 11 Mass.App.Ct. at 362, 416 N.E.2d at 530).

Riverdale's reliance on *Loomis v. Tulip, Inc.*, 9 F.Supp.2d 22 (D. Mass. 1998) is misplaced.  (Dkt. No. 57 at 8.)  In *Loomis*, an attorney for one party in a dispute over control of inventory and equipment discouraged a commercial landlord from leasing space in which the inventory was located to the opposing party.  *Id.* at 26.  The ability to lease the space "appears to have determined which of [the opposing parties] maintained control of the inventory and equipment at issue in the supervening litigation."  *Id.*  The plaintiff's "inability to lease [the space] directly impacted its claims for liability and damages in the supervening litigation.  In

fact, had it been able to lease the facility, its claim of total conversion would have been extinguished.  In addition, its motion practice during this litigation may have differed had the communication not occurred and had it obtained such a lease." *Id.*  Thus, the landlord "possessed at least a limited legal interest in the outcome of the litigation at the time of the purported communication" and the communication directly affected the opposing party's litigation strategy.  *Id.*  The court concluded that the correspondence related to the litigation and was covered by the litigation privilege.  *Id.*[6]  Unlike the landlord who received the statements at issue in *Loomis*, the recipients of Mr. Walsh's emails do not have a legal interest in the outcome of this litigation, in which the remedies that Riverdale seeks would only benefit Riverdale.  (*See* Dkt. No. 1, Complaint.)   Accordingly, *Loomis* does not support a finding that the litigation privilege shields Riverdale's unnecessary statements to Defendants' customers.

### B.  Allowing Defendants' Counterclaims To Proceed Will Not Chill Riverdale's And Its Counsel's Ability To Fully Advocate Riverdale's Positions

Allowing Defendants' counterclaims to proceed will not "'inhibit [Riverdale] or [its] attorneys from fully investigating their claims or completely detailing them for the court or other parties….'"  *Id.* at 309-10 (*quoting Milford Power Ltd. P'Ship v. New England Power Co.*, 918 F.Supp. 471, 486 (D. Mass. 1996)).  Indeed, Riverdale does not argue that it or its counsel would be unable to fully advocate Riverdale's positions if Defendants' counterclaims are allowed to remain.  In *Encompass*, the plaintiff, after filing the lawsuit, issued a press release that included statements copied from the pleadings but also statements about its investigation, the costs to consumers of the type of fraud at issue in the litigation, and the plaintiff's commitment to fighting such fraud.  *Id.* at 306-07.  The press release was not sent to the defendants' customers

---

[6] *Loomis* has been rejected by at least one Massachusetts court, which refused to follow the case and characterized its holding as having "boldly go[ne] where no Massachusetts court has gone before." *Nekoroski v. Mathai*, No. 11-4315-BLS1, 30 Mass. L. Rptr. 485, *6 n.7 (Sup. Ct. Sept. 28, 2012).

12

but, rather, was published in a trade publication and appeared in certain online news outlets. *Id.* at 307. The defendants filed counterclaims based on the press release, alleging that the plaintiff's statements "constituted defamation and libel, interfered with their advantageous business relations, amounted to unfair and deceptive acts or practices in violation of [M.G.L. c.] 93A, and violated the Lanham Act." *Id.* at 309. The plaintiff moved to dismiss the counterclaims based on, *inter alia*, the litigation privilege. *Id.*

The *Encompass* court first considered the policy underlying the litigation privilege. The court noted that the privilege "rests on the policy of permitting attorneys complete freedom of expression and candor in communications in their efforts to secure justice for their clients." *Id.* at 308 (*quoting Davidson v. Cao*, 211 F.Supp.2d 264, 275 (D. Mass. 2002)). However, this policy is not implicated when the relevant statements are made "under circumstances where 'the need for unbridled advocacy is diminished, and ***the need to protect the intrusion upon a person's reputation is enhanced.***'" *Id.* at 309 (*quoting Med. Informatics Eng'g, Inc. v. Orthopaedics Northeast, P.C.*, 458 F.Supp.2d 716, 724 (N.D. Ind. 2006) (emphasis added)). More specifically, when third party communications "'will not inhibit parties or their attorneys from fully investigating their claims or completely detailing them for the court or other parties' and are not subject to 'judicial control', the necessity for the privilege disappears." *Id.* at 309-10. "Thus, policy considerations, as well as 'the great weight of authority[,]' counsel against applying the privilege to extra-judicial statements" that do ***not*** inhibit advocacy. *Id.* at 310. Applying these principles, the *Encompass* court found that the litigation privilege did not shield the plaintiff's third-party communications. *Id.*

Although *Encompass* involved third party communications in the form of a press release, the court's analysis regarding the lack of applicability of the litigation privilege in that context

13

compels the same conclusion here.   Like the communication in *Encompass*, Riverdale's unreasonable and unnecessary statements to Defendants' customers do ***not*** advance the policy upon which the privilege rests because they do not "'inhibit [Defendants] or their attorneys from fully investigating their claims or completely detailing them for the court or other parties' and are not subject to 'judicial control....'"  *Id.* at 309-10 (*quoting Milford Power*, 918 F.Supp. at 486).  Riverdale does not argue otherwise in its motion.  Instead, it argues that the subject line of the emails is "Riverdale Mills vrs [sic] Cavatorta NA et al." and the litigation is referenced in the emails.  However, merely referencing the underlying litigation does not render the statements at issue pertinent to the litigation.  Otherwise, a party could say anything about its opponent, to anyone, without fear of liability so long as the party referenced the litigation somewhere in its statement.  *Cf. Id.* (rejecting the plaintiff's argument that the statements at issue were privileged because the communication included references to the underlying lawsuit).

Furthermore, Riverdale's statements were directed specifically at parties that it knew were Defendants' customers, which is a relationship where "the need to protect the intrusion upon [the Defendants'] reputation is enhanced."  *Id.* at 309.  This is particularly true here because there was no need for Riverdale to make the statements to these customers, all of whom Riverdale knew had been informed about the issues months before.  Thus, Riverdale's statements were intended, as Mr. Walsh testified, "to try to gain market share from Cavatorta's misstep." (Exh. 1, Day 1 Tr., at 83:10-15; *see also Id.* at 88:2-5.)  The litigation privilege does not shield such statements.

## III.   CAVATORTA'S   COUNTERCLAIMS   ESTABLISH   THE   REQUISITE ELEMENTS PURSUANT TO FED. R. CIV. P. 8

Riverdale argues essentially that Cavatorta's counterclaims must provide sufficient evidence to prove those claims, rather than merely place Riverdale on notice of the bases for the

14

claims.  For example, Riverdale cites *Skyhook Wireless, Inc. v. Google Inc.*, 86 Mass. App. Ct. 611 (2014).  (Dkt. No. 59 at 10.)  However, *Skyhook* is an appeal from a summary judgment ruling in the defendant's favor.  *Id.* at 611-12.  Similarly, *Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B.*, 62 Mass. App. Ct. 34 (2004), (Dkt. No. 59 at 10), is an appeal from a jury verdict in plaintiff's favor on its claim for tortious interference with an advantageous business relationship.  *Id.* at 34-35.  These cases have no relevance in the present context of a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6).[7]

"Under the liberal notice pleading standard established by FED. R. CIV. P. 8(a), a counterclaim plaintiff is required to submit 'a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the [counterclaim] defendant fair notice of what the claim is and the grounds upon which it rests.'"  *Encompass*, 522 F.Supp.2d at 307-08 (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Thus, counterclaim plaintiffs "only are obliged to set forth in their [counterclaims] factual allegations[,] either direct or inferential, regarding each material element necessary to sustain recovery under some actionable legal theory."  *Id.* at 308 (*quoting Raytheon Co. v. Cont'l Cas. Co.*, 123 F.Supp.2d 22, 26-27 (D. Mass. 2000)).  "[T]he factual allegations 'must be enough to raise a right to relief above the speculative level on the assumption that the allegations in the [counterclaim] are true (even if doubtful in fact)."  *Id.* (*quoting Twombly*, 550 U.S. at 555).  Cavatorta's counterclaims meet these standards, and the Court should deny Riverdale's Motion to Dismiss.

---

[7] Riverdale also relies on *Getty Petroleum Mktg., Inc. v.2211 Realty, LLC*, Civil Action No. 11-40003-FDS, 2012 WL 527655 (D. Mass. Feb. 16, 2012).  (Dkt. No. 59 at 9.)  However, the *Getty* court applied Rhode Island law—not Massachusetts law.  *Id.* at *4-*5.  Therefore, *Getty* also is not relevant here.

**A.      Cavatorta Has Pled Sufficient Facts To Support Its Counterclaim For Tortious Interference With Business Relations**

A party claiming tortious interference with business relations must plead the following elements:  (i) a business relationship or contemplated contract of economic benefit; (ii) the counterclaim defendant's knowledge of such relationship; (iii) the counterclaim defendant's intentional and malicious interference with it; and (iv) the counterclaim plaintiff's loss of advantage directly resulting from the counterclaim defendant's conduct.  *See Welch v. Ciampa*, 542 F.2d 927, 943-44 (1st Cir. 2008) (*quoting Comey v. Hil*, 387 Mass. 11, 438 N.E.2d 811, 816 (1982)).  Cavatorta's counterclaims include each of these factors.  For example, Cavatorta pleaded:

> 12.     Upon learning about the aforementioned production error, Riverdale Mills also reached out to known customers of Cavatorta and Metallurgica and informed that Cavatorta and/or Metallurgica had sold product that was not the SEAPLAX™ product as ordered.

*      *      *

> 21.     Riverdale Mills knew of certain business relationships between Metallurgica and its customers.

(Dkt. No. 40, Cavatorta Answer and Counterclaims, at 13-14.)  These allegations meet the first two factors.  Cavatorta's counterclaims also include the following allegations, which meet the third factor:

> 14.     Riverdale Mills informed Cavatorta and Metallurgica customers that Cavatorta supplied defective wire.

> 15.     Riverdale Mills informed Cavatorta and Metallurgica customers that "traps are falling apart very quickly."

> 16.     Riverdale Mills informed Cavatorta and Metallurgica customers that it was taking legal action against Cavatorta and Metallurgica and sent various pleadings to known customers of Cavatorta and Metallurgica.

17.     Riverdale Mills knowingly contacted customers of Cavatorta and Metallurgica in a concerted effort to induce those customers to terminate their business relationships with Cavatorta and Metallurgica.

18.     Riverdale Mills acted with malice and improper motives in contacting known customers of Cavatorta and Metallurgica.

*       *       *

22.     Riverdale Mills knowingly attempted to induce Metallurgica customers to terminate their business relationships with Metallurgica.

23.     Riverdale Mills acted in bad faith and with malice and improper motive.

(*Id.*)  Cavatorta's counterclaims also meet the final element of a cause of action for tortious interference with business relations, namely loss of advantage directly resulting from the counterclaim defendant's conduct:  "Cavatorta has been harmed by the actions of Riverdale Mills."  (*Id.* at 14 (¶¶ 19, 24).)  Therefore, Cavatorta's counterclaims plead sufficient allegations to support a claim for tortious interference with business relations, and the Court should deny Riverdale's motion in this regard.[8]

**B.     Cavatorta Has Also Pled Sufficient Facts To Support Its Counterclaim For Violation Of M.G.L. c. 93A**

To support a counterclaim for unfair business practices pursuant to M.G.L. c. 93A, a counterclaim plaintiff must plead "that a person who is engaged in trade or business committed an unfair or deceptive trade practice and that the [counterclaim plaintiff] suffered a loss of money or property as a result."  *Gabriel v. Jackson Nat. Life Ins. Co.*, C.A. No. 11-12307-MLW, 2015 WL 141046, *16 (D. Mass. Mar. 26, 2015) (*quoting Morris v. BAC Home Loans Servicing, L.P.*, 775 F.Supp.2d 255, 259 (D. Mass. 2011)).  In addition to the allegations quoted above, all of which are incorporated into Cavatorta's M.G.L. c. 93A counterclaim, Cavatorta pled that "[a]t all times material hereto, Riverdale Mills and Cavatorta were engaged in trade or commerce

---

[8] Riverdale argues that Cavatorta's counterclaim for tortious interference with business relations is based on Riverdale's filing of its Complaint.  (Dkt. No. 59 at 9-10.)  As discussed herein, that is not correct.

17

pursuant to G.L. c. 93A."  (Dkt. No. 40, Cavatorta Answer and Counterclaims, at 14 (¶ 26).)

Accordingly, Cavatorta's second counterclaim meets the "liberal notice pleading standard

established by FED. R. CIV. P. 8(a)," *Encompass*, 522 F.Supp.2d at 307-08, and the Court should

deny Riverdale's motion.

Riverdale again argues, as it did in relation to Cavatorta's first counterclaim, that

Cavatorta must plead sufficient facts to ***prove*** its counterclaim for violation of M.G.L. c. 93A.

(Dkt. No. 59 at 10-11 (relying upon *Henry v. Nat'l Geographic Soc'y*, 147 F.Supp.2d 16, 21 (D.

Mass. 2001) (granting summary judgment on claim for violation of M.G.L. c. 93A))).  These

arguments are not relevant in the context of a motion to dismiss.

The Court should deny Riverdale's motion to dismiss Cavatorta's counterclaims, both of

which properly plead all of necessary elements of the respective claims.[9]

## CONCLUSION

The Court should deny Riverdale's motion.  First, the litigation privilege does not apply

because the unnecessary statements that Riverdale made to Defendants' customers "to try to gain

market share as a result of Cavatorta's misstep" are not pertinent to the lawsuit.  Moreover, the

litigation privilege is not triggered because allowing Cavatorta's counterclaims to proceed will

not undermine Riverdale's or its counsel's advocacy in favor of Riverdale's claims.  Second,

Cavatorta's counterclaims sufficiently plead the elements of the respective counterclaims

pursuant to the "liberal notice pleading standard established by FED. R. CIV. P. 8(a)."

Accordingly, accepting as true all well-pleaded facts and drawing all reasonable inferences in

favor of Cavatorta, as required in assessing Riverdale's Motion to Dismiss, the Court should

deny that motion.

---

[9] If the Court determines that either of Cavatorta's counterclaims is deficient, Cavatorta requests, in the
alternative, leave to re-file the relevant counterclaim(s).

Dated:  March 11, 2016                    CAVATORTA NORTH AMERICA, INC. and
                                          METALLURGICA ABRUZZESE SpA

                                          /s/ *Kevin J. O'Shea*


                                          /s/ *Courtney E. Mayo*
                                          Courtney E. Mayo, Esquire
                                          BBO # 657790
                                          cmayo@hassettanddonnelly.com
                                          Paul S. Rainville, Esquire
                                          BBO # 561945
                                          prainville@hassettanddonnelly.com
                                          Hassett & Donnelly, P.C.
                                          446 Main Street - 12th Floor
                                          Worcester, MA 01608
                                          Phone:  (508) 791-6287


                                          Kevin J. O'Shea  (*admitted pro hac vice*)
                                          kevin.oshea@icemiller.com
                                          Ice Miller LLP
                                          200 W. Madison Street
                                          Suite 3500
                                          Chicago, IL 60606
                                          Phone: (312) 726-7163

C\773514.1

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2016, a copy of the foregoing was filed electronically with the Clerk for the United States District Court for the District of Massachusetts using the CM/ECF system.

/s/ *Courtney E. Mayo*
Courtney E. Mayo

C:\773514.1