**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                           )
**RIVERDALE MILLS CORPORATION,**  )
                                           )    **CIVIL ACTION**
        **Plaintiff,**          )
                                           )    **NO. 4:15-CV-40132-TSH**
        v.                       )
                                           )
**CAVATORTA NORTH AMERICA, INC.,**  )
**METALLURGICA ABRUZZESE SPA,**    )
**AND TRAFILERIA E ZINCHERIA**       )
**CAVATORTA SPA,**                        )
                                           )
        **Defendants.**        )
_____ )

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTIONS TO DISMISS**
**DEFENDANTS' COUNTERCLAIMS (Docket Nos. 53, 55, 58, 60)**

**May 26, 2016**

**HILLMAN, D.J.**

In this ongoing dispute between two competing wire-mesh distributors, Riverdale Mills Corporation (Plaintiff) moves to dismiss counterclaims filed by Cavatorta North America, Inc. (Cavatorta) and Metallurgica Abruzzese SPA (Metallurgica) (collectively, Defendants). Plaintiff moves to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, asserting that the conduct underlying the counterclaims was protected by the litigation privilege and that the claims are insufficiently pled. Plaintiff also moves specially to dismiss pursuant to Mass. Gen. Laws ch. 231, § 59H, the so-called "anti-SLAPP" statute. For the reasons set forth below, Plaintiff's Rule 12(b)(6) motions (Docket Nos. 53 & 58) are ***granted***. Plaintiff's anti-SLAPP motions (Docket Nos. 55 & 60) are ***denied***. The counterclaims will be dismissed without prejudice, and Defendants are granted leave to amend.

**Background**

The parties manufacture and sell competing brands of wire mesh that is used to make marine traps. Riverdale manufactures and sells a product called "Aquamesh." Metallurgica manufactures a product called "SEAPLAX," which is sold in the United States by Cavatorta. Both brands of mesh are purported to be "galvanized after welded" (GAW), which is allegedly a superior manufacturing process to mesh that is "galvanized before welded" (GBW). In or around late May of 2015, Riverdale learned of a production error at Metallurgica that caused a non-SEAPLAX, non-GAW product to be delivered to certain customers in the United States and Canada who had ordered SEAPLAX between 2014 and 2015.

Riverdale brought this lawsuit against Metallurgica, Cavatorta, and a third entity, Trafileria E Zincheria Cavatorta SPA, alleging that the Defendants had falsely advertised SEAPLAX as GAW when in fact it was GBW. Riverdale alleged: (1) false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a); (2) violation of Mass. Gen. Laws ch. 266, § 91; (3) violations of Mass. Gen. Laws ch. 93A; and (4) common law unfair competition. Riverdale also moved for a preliminary injunction. After an evidentiary hearing, this Court issued an order enjoining the Defendants from (1) manufacturing and selling mesh labeled as GAW if it was not actually GAW; and (2) making false statements in advertising that SEAPLAX was GAW if it was not in fact GAW. This Court also ordered Defendants to immediately label all SEAPLAX product that was not GAW as being not GAW.

After this Court's decision on the preliminary injunction, Metallurgica and Cavatorta separately answered Riverdale's complaint, each asserting counterclaims for tortious interference with business relations and violations of Chapter 93A. These counterclaims were based on

communications that Riverdale had made to some of Cavatorta's customers during the pendency of this lawsuit. Riverdale now moves to dismiss the counterclaims.

The communications in question were emails sent by Larry Walsh, vice president of sales and marketing at Riverdale, to twelve customers of Cavatorta. Each email was accompanied by copies of: (1) a three-page excerpt from Defendants' memorandum in opposition to Plaintiff's motion for preliminary injunction; (2) the affidavit of Peter Christian, Director of Cavatorta; and (3) the affidavit of Andrea Contini, export manager for Metallurgica. The affidavits had been filed along with Defendants' opposition to the preliminary injunction motion. Two customers were later subpoenaed to produce documents.

The emails were short and varied somewhat in their content. Some acknowledged that the customers already knew about the lawsuit; all referenced the attached materials and stated that Plaintiff's attorney would contact the customers and request additional information. One email also stated: "If you did get GBW that was labeled GAW you should have received a notice from [Cavatorta] and some sort of monetary compensation . . . . For a full year [Defendants] were selling mislabeled product and traps are falling apart very quickly." (Docket No. 64-3 at 13.) Another email characterized Cavatorta's product as "defective wire." (Docket No. 64-3 at 16.) According to Defendants, these statements were false. Defendants further allege that Riverdale "knowingly contacted" their customers "in a concerted effort to induce those customers to terminate their business relationships with Cavatorta and/or Metallurgica." (Docket No. 40 at ¶ 17; No. 46 at ¶ 14.) According to Defendants, Riverdale "acted with malice and improper motives in contacting known customers of Cavatorta and Metallurgica," and Defendants have "been harmed by the aforementioned actions" of Riverdale. (Docket No. 40 at ¶¶ 18-19; No. 46 at ¶¶ 15-16.)

**Discussion**

Riverdale has filed four motions to dismiss the Defendants' counterclaims, one for each Defendant under Rule 12(b)(6) and under the anti-SLAPP statute, Mass. Gen. Laws ch. 231, § 59H. Defendants have filed separate responses. Because the arguments are identical with regard to each Defendant, I shall analyze them together.

*1. The 12(b)(6) Motions*

*A. Standard of Review*

To survive a motion to dismiss, a counterclaim must contain "sufficient factual matter" to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). That is, the counterclaim must plead "factual content that allows the court to draw the reasonable inference that the [alleged wrongdoer] is liable for the misconduct alleged." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly,* 550 U.S. at 555). "Nor does a [counterclaim] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly,* 550 U.S. at 557).

In reviewing the motion, the court's inquiry is limited to the facts alleged in the counterclaim, incorporated into the pleading, or susceptible to judicial notice. *In re Colonial Mortg. Bankers Corp.,* 324 F.3d 12, 15 (1st Cir. 2003). The court assumes the truth of all well-pled factual allegations and draws all reasonable inferences in the nonmovant's favor. *Genzyme Corp. v. Fed. Ins. Co.,* 622 F.3d 62, 68 (1st Cir. 2010).

B. *Analysis*

i.   *The Litigation Privilege*

First, Riverdale argues that Defendants' claims for tortious interference with business relations should be dismissed because Riverdale's communications with Defendants' customers were protected by the litigation privilege. The litigation privilege "protects statements made in the institution or conduct of litigation or in conferences and other communications preliminary to litigation." *Encompass Ins. Co. of MA v. Giampa*, 522 F. Supp. 2d 300, 308 (D. Mass. 2007) (quoting *Taylor v. Swartwout,* 445 F. Supp. 2d 98, 102 (D. Mass. 2006)) (citation omitted). The privilege "rests on the policy of permitting attorneys complete freedom of expression and candor in communications in their efforts to secure justice for their clients." *Id.* (quoting *Davidson v. Cao,* 211 F. Supp. 2d 264, 275 (D. Mass. 2002)) (citations omitted). The privilege may be applied to statements made by parties to non-parties; the relevant inquiry is not who made the statement, or to whom it was made, but whether the statement is pertinent to the supervening litigation. *Id.*; *Loomis v. Tulip, Inc.*, 9 F. Supp. 2d 22, 25 (D. Mass. 1998).

The privilege applies "even if the offensive statements are uttered maliciously or in bad faith." *Encompass*, 522 F. Supp. 2d at 308 (quoting *Taylor,* 445 F. Supp. 2d at 103) (citation omitted). However, the privilege "may not be exploited as an opportunity to defame with impunity," and it does not protect "unnecessary or unreasonable publication to parties outside the litigation . . . ." *Id.* (quoting *Taylor,* 445 F. Supp. 2d at 102). The application of the privilege "is determined on a case-by-case basis, after a fact-specific analysis." *Mack v. Wells Fargo Bank, N.A.*, 41 N.E.3d 323, 327 (Mass. App. Ct. 2015) (citation omitted).

Riverdale argues that the emails were privileged because they were pertinent to this lawsuit. Riverdale points to the following facts: the subject line of the emails was "Riverdale

versus Cavatorta" or some variant thereof; the emails referred to the litigation; one of the pleadings was attached to the emails; the emails stated that Riverdale's attorneys would be requesting more information from the customers; and the emails were sent during the discovery period for the motion for preliminary injunctive relief.  In response, Defendants argue that Riverdale's communications were unnecessary, inappropriate, and intended to harm Defendants.  Defendants contend that Riverdale knew before sending the emails that all of the customer-recipients had already been made aware of the issues with the SEAPLAX mesh and that Defendants were already working with the customers to resolve any remaining problems.  Defendants further argue that the emails were not pertinent to this lawsuit because Walsh did not seek any information from the customers.

Riverdale relies on *Loomis v. Tulip, Inc.*, 9 F. Supp. 2d 22 (D. Mass. 1998), to support its argument that the emails were privileged.  In *Loomis*, after a botched negotiation of a storage facility lease, the prospective tenant brought a claim for tortious interference against the former tenant's attorney for a statement he had made to the nonparty landlord. *Id.* at 23.  Specifically, the attorney had asked the landlord to refrain from entering into a lease with the plaintiff for one day while the former tenant decided whether it would holdover its existing lease. *Id.* at 23 n.1.  The court found that the statement was "inextricably tied to the supervening litigation" between the prospective and former tenants, and therefore privileged, because the parties' abilities to obtain the leasehold from the landlord were determinative of which of them maintained control of certain inventory that was the subject of the lawsuit. *Id.* at 26.  Riverdale argues that its emails were like the communications in *Loomis*, because they were related to the issue of whether a particular customer was affected by the instant suit.

Defendants, on the other hand, rely on *Encompass Ins. Co. of MA v. Giampa*, in which the plaintiff, after filing a lawsuit, issued a press release that included statements copied from the pleadings, as well as statements about the investigation, the costs to consumers of the type of fraud at issue in the litigation, and the plaintiff's commitment to fighting such fraud. 522 F. Supp. 2d. at 306-07. The press release was published in a trade publication and appeared in certain online news outlets. *Id.* at 307. The court found that the press release was not privileged, because the statements were released to the media, were not subject to judicial control, and went beyond merely restating matters that were already in court documents. *Id.* at 309-10. Defendants argue that the *Encompass* court's analysis applies here, because Riverdale's statements to Defendants' customers were not subject to judicial control, and the protection of these statements would not advance the policy behind the privilege. Moreover, because Riverdale knew that the recipients of the statements were Defendants' customers, "the need for unbridled advocacy is diminished, and the need to protect the intrusion upon a person's reputation is enhanced." *Id.* at 309 (citation omitted).

I find that Riverdale's emails are more like the press release in *Encompass* and less like the statement in *Loomis*. The recipients were outside of the litigation, and it did not serve Riverdale's prosecution of the case to reiterate its claims and forward the selected pleadings to Defendants' customers, many—if not all—of whom already knew about the lawsuit. Moreover, although Riverdale claims that the purpose of the emails was to warn customers of impending subpoenas, only two customers were actually subpoenaed to produce documents. The purpose of the privilege is not served by giving Riverdale immunity to send gratuitous communications to the customers of its competitors. *See Encompass*, 522 F. Supp. 2d at 308; *see also MHA Fin. Corp. v. Varenko Investments Ltd.*, 583 F. Supp. 2d 173, 183 (D. Mass. 2008) (defendant who published complaint to parties outside the litigation was not protected by the litigation privilege).

Additionally, the instant case is distinguishable from factual scenarios in which statements were found to be connected to the litigation. *See, e.g., Kimmel & Silverman, P.C. v. Porro*, 53 F. Supp. 3d 325, 343 (D. Mass. 2014) (privilege applied to attorneys' filing of deposition transcripts and email chain with the court in support of their client's opposition to a motion to dismiss); *Int'l Floor Crafts, Inc. v. Adams*, 477 F. Supp. 2d 336, 340 (D. Mass. 2007) (privilege applied to statements made in a complaint); *Taylor*, 429 F. Supp. 2d at 215 (privilege applied to attorney's disclosure of documents showing plaintiff's alleged drug use during custody battle); *Visnick v. Caulfield*, 901 N.E.2d 1261, 1262 (Mass. App. Ct. 2009) (privilege applied to a letter sent by an employee to her former employer, outlining impending discrimination claims that she would file if the employer did not compensate her, as well as to related EEOC filings). Accordingly, based upon the record before me, I find that the emails are not covered by the litigation privilege, and Plaintiff's motions to dismiss will not be granted on this basis.

ii.      *Failure to State a Claim*

Next, Riverdale argues that Defendants have failed to state a prima facie case of intentional interference with business relationships or violations of Chapter 93A. In order to prevail on a claim for tortious interference with an advantageous relationship, a plaintiff must prove the following elements: "(1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's intentional and malicious interference with it; (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct." *Welch v. Ciampa*, 542 F.3d 927, 943-44 (1st Cir. 2008) (quoting *Comey v. Hill,* 438 N.E.2d 811, 816 (Mass. 1982)).

Defendants have sufficiently alleged the first two elements of the tortious interference claim by stating that Riverdale knew that the recipients of the emails were Defendants' customers.

(Docket No. 40 at ¶¶ 10-12; No. 46 at ¶¶ 7-9.)  Regarding the third element, Defendants' counterclaims state that Riverdale informed Defendants' customers that they had been selling mislabeled product for a full year; that they had supplied "defective wire"; that SEAPLAX traps were "falling apart very quickly;" and that Riverdale was taking legal action against them. (Docket No. 40 at ¶¶ 13-16; No. 46 at ¶ 10-13.)  These facts are sufficient to imply that Riverdale intended to damage Defendants' relationships with these customers.  However, as for the fourth element—harm—the Defendants state only that they "ha[ve] been harmed by the actions of Riverdale Mills." (Docket No. 40 at ¶¶ 19, 24; No. 46 at ¶¶ 16, 21.)  The counterclaims contain no specific allegations of harm, such as an allegation that customers terminated their relationships with Defendants or that Defendants experienced a drop in sales as a result of the emails.  The absence of this fourth element is fatal to Defendants' claims for tortious interference, as well as to their claims under Chapter 93A, which also requires a showing of harm.  *See* Mass. Gen. Laws ch. 93A, § 11.  Accordingly, Plaintiff's motions to dismiss are granted.  Defendants counterclaims are dismissed without prejudice, and Defendants are granted leave to amend within fourteen days of the date of this order.

## 2. *The Anti-SLAPP Special Motions to Dismiss*

Riverdale also moves specially to dismiss Defendants' counterclaims pursuant to Mass. Gen. Laws ch. 231, § 59H (the anti-SLAPP statute).  The anti-SLAPP statute provides in pertinent part:

> In any case in which a party asserts that the civil claims, counterclaims, or cross claims against said party are based on said party's exercise of its right of petition under the constitution of the United States or of the commonwealth, said party may bring a special motion to dismiss.
> . . .
> As used in this section, the words "a party's exercise of its right of petition" shall mean any written or oral statement made before or

> submitted to a legislative, executive, or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive, or judicial body or any other governmental proceeding; any statement reasonably likely to enlist public participation in an effort to effect such consideration; or any other statement falling within constitutional protection of the right to petition government.

Mass. Gen. Laws ch. 231, § 59H. The statute also provides that if the moving party prevails, she is entitled to costs and reasonable attorneys' fees. *Id.*

"SLAPP" is an acronym for "strategic litigation against public participation." Thus, "[t]he anti-SLAPP statute was enacted to protect citizens from lawsuits designed to chill their right to petition the government for redress of grievances." *Fisher v. Lint*, 868 N.E.2d 161, 165 (Mass. App. Ct. 2007) (citations omitted). "The purpose of filing a SLAPP suit is not to prevail in the matter, but rather to use litigation to chill, intimidate, or punish citizens who have exercised their constitutional right to petition the government to redress a grievance." *Id.* (citations omitted). The courts have construed "petitioning activity" as including all "statements made to influence, inform, or at the very least, reach governmental bodies—either directly or indirectly." *Ehrlich v. Stern*, 908 N.E.2d 797, 801 (Mass. App. Ct. 2009) (quoting *North Am. Expositions Co. Ltd. Partnership v. Corcoran,* 898 N.E.2d 831, 841 (Mass. 2009)). The anti-SLAPP statute provides "a quick remedy for those citizens targeted by frivolous lawsuits" based on these activities. *Kobrin v. Gastfriend*, 821 N.E.2d 60, 63 (Mass. 2005).

Procedurally, the court's review of an anti-SLAPP motion has two components. First, the moving party "must demonstrate, through pleadings and affidavits, that the plaintiff's claims are based on 'petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities.'" *Wenger v. Aceto*, 883 N.E.2d 262, 266 (Mass. 2008) (quoting *Duracraft*

10

*Corp. v. Holmes Products Corp.*, 691 N.E.2d 935, 943 (Mass. 1998)).  The focus of this inquiry is solely on the conduct complained of in the lawsuit. *Cadle Co. v. Schlichtmann*, 859 N.E.2d 858, 864 (Mass. 2007) (quoting *Office One, Inc. v. Lopez*, 769 N.E.2d 749, 757 (Mass. 2002)).  Typical categories of petitioning activities include "reporting violations of law, writing to government officials, attending public hearings, testifying before government bodies, circulating petitions for signature, lobbying for legislation, campaigning in initiative or referendum elections, filing agency protests or appeals, being parties in law-reform lawsuits, and engaging in peaceful boycotts and demonstrations." *Id.* at 863 (quoting *Duracraft*, 691 N.E.2d at 940).

"[I]f the *only* conduct complained of is petitioning activity, then there can be no other 'substantial basis' for the claim." *Id.* at 864 (quoting *Lopez*, 769 N.E.2d at 757).  If the movant makes this showing, then the burden shifts to the nonmoving party to demonstrate "that the moving party's petitioning activities were 'devoid of any reasonable factual support or any arguable basis in law' and the petitioning activities 'caused actual injury to the responding party.'" *Wenger*, 883 N.E.2d at 266 (quoting § 59H).

Riverdale argues that Defendants' counterclaims should be dismissed because these claims targeted the emails, which, they contend, were petitioning activity.  Riverdale asserts that the email communications were "quintessential petitioning activity," because their purpose was to inform the recipient customers that they would be receiving subpoenas in connection with the pending lawsuit. (Docket Nos. 56 at 2; 61 at 2.)

Riverdale further argues that the communications were petitioning activity because the statements mirrored the allegations contained in the pleadings.  In this regard, Riverdale relies on *Wynne v. Creigle*, in which a firefighter's widow made statements to a newspaper reporter in connection with a departmental investigation of her husband's co-worker's workplace conduct.

11

825 N.E.2d 559, 562-63 (Mass. App. Ct. 2005). The widow had repeated to the reporter that her husband's suicide was precipitated by harassment by the co-worker. *Id.* at 563. The co-worker sued the widow for defamation, based on the newspaper's accounts of the statements, and the court held that the statements were protected petitioning activity. *Id.* at 563, 566. However, the widow's statements were not unsolicited; they were made in direct response to statements of the co-worker, as well as documents from disciplinary hearings, and were "essentially mirror images of those [the widow] made during and 'in connection with' the departmental investigation of the [co-worker]." *Id.* at 565-66. Thus, taken in context, the "mere repetition of those statements to the media was also possessed of the characteristics of petitioning activity." *Id.* at 566.

Despite the holding in *Wynne*, the mere replication of protected statements sent to governmental entities is not alone dispositive. *Kalter v. Wood*, 855 N.E.2d 421, 424 (Mass. App. Ct. 2006). "Individuals who petition the government are not necessarily free to engage in gratuitous publication of the petition elsewhere without consequence." *Id.* Whether a particular communication is petitioning activity depends on the facts and circumstances of each situation. *See id.* at 423-24.

Here, the email communications included some statements that overlapped with the allegations made by Riverdale in this lawsuit. However, given the context—Riverdale and Defendants are direct competitors; the attachments to the emails were a selection of Defendants' memorandum and affidavits; and only two customers were later subpoenaed—the emails have a distinctly commercial flavor. I find that this situation is less like the facts of *Wynne* and more like those of *Cadle Co. v. Schlichtmann*, in which an attorney published information on his website and made statements to the media about the unscrupulous practices of a debt-collection company with whom the attorney had been engaged in protracted bankruptcy-related litigation. 859 N.E.2d

at 864. The court held that the attorney's communications were not petitioning activity, because the attorney had set up the website for commercial reasons, as an informational center that would attract clients. *Id.* The fact that the attorney's statements also referred to various ongoing judicial and administrative proceedings did not, by itself, suffice to render the statements petitioning activity. *Id.* at 865; *see also Ehrlich*, 908 N.E.2d at 805 ("it is the palpable commercial motivation behind the creation of the Web site that so definitively undercuts the petitioning character of the statements contained therein.").

Considering the context within which Riverdale's emails were sent, they served Riverdale's commercial purpose of attracting potential customers by sharing unfavorable information about Defendants. Thus, the emails were not petitioning activity, and Riverdale has failed to meet its burden regarding the first prong of the anti-SLAPP analysis. Riverdale's special motions to dismiss will be denied.

## Conclusion

For the reason set forth above, Plaintiff's Rule 12(b)(6) motions (Docket Nos. 53 & 58) are ***granted***. Plaintiff's anti-SLAPP motions (Docket Nos. 55 & 60) are ***denied***. The counterclaims are dismissed without prejudice, and Defendants are granted leave to amend within fourteen days of the date of this order.

**SO ORDERED.**

                                                     ***/s/ Timothy S. Hillman***
                                                     **TIMOTHY S. HILLMAN**
                                                     **DISTRICT JUDGE**